Elaine **FREDERICK**, Individually and on behalf of herself and all others similarly situated, Plaintiff,

v.

Donna **SHALALA**, in her capacity as Secretary of Health and Human Services, Michael Dowling, in his capacity as Commissioner of the New York State Department of Social Services, and James V. Murray, in his capacity as Commissioner of the Steuben County Department of Social Services, Defendants.

No. 94–CV–6364L.

United States District Court, W.D. New York.

Sept. 1, 1994.

parties in this action and to avoid duplicative actions in Federal and State Courts." Complaint ¶ 6.

David B. Pels, Southern Tier Legal Services, Bath, NY, Susan Antos, Greater Upstate Law Project, Albany, NY, for plaintiff.

Anne VanGraafeiland, Asst. U.S. Atty., Rochester, NY, for Donna E. Shalala.

Charles D. Steinman, Asst. Atty. Gen., Rochester, NY, for Michael Dowling.

John F. Leyden, Asst. Steuben County Atty., Bath, NY, for James V. Murray.

## DECISION AND ORDER

LARIMER, District Judge.

Plaintiff, Elaine Frederick, has applied for and been denied benefits under the Aid to Families with Dependent Children ("AFDC") program. The reason for the denial was that she has equity in a car appraised at $4000 and both federal and state regulations provide that AFDC recipients may have no more than $1500 equity in a vehicle. Plaintiff commenced this action seeking a declaration that those regulations, 45 C.F.R. § 233.-20(a)(3)(i)(B)(2) and 18 N.Y.C.R.R. § 352.-23(b)(2), are unlawful, and enjoining defendants from relying on those regulations when determining eligibility for AFDC benefits in New York State. Pending before the court is plaintiff's motion for a preliminary injunction directing defendants to provide her with a two-person AFDC grant for her and her son pending the resolution of this case.

### · FACTUAL BACKGROUND

The facts are virtually undisputed. Plaintiff lives in Bath, New York with her son Braxton. Braxton, who was born on September 11, 1993, suffers from certain medical problems that require occasional visits to physicians and other health care professionals. Some of these appointments are in Rochester, which is approximately a 150–mile round trip from plaintiff's home.

On May 24, 1994, plaintiff applied for AFDC benefits for herself and Braxton at the Steuben County Department of Social

Services ("SCDSS"). By a notice dated June 13, 1994, SCDSS informed plaintiff that her application was denied because plaintiff owns a vehicle which SCDSS appraised at $4000, which exceeds the $1500 limit that is at issue in this litigation.

Plaintiff alleges that she is unemployed and that her only income since May 1994 is $200 that her estranged husband sent her. She states that she needs her car to take Braxton to his medical appointments and to seek employment. She alleges that if she does not receive AFDC benefits soon she may face eviction from her apartment and will be unable to purchase necessities.

### STATUTORY AND REGULATORY SCHEME

AFDC is a joint federal-state program which is designed "to furnish financial assistance ... to needy dependent children and the parents or relatives with whom they are living." 42 U.S.C. § 601. New York State is a participant in the program.

Regulations promulgated by the Secretary of Health and Human Services ("HHS") have long set certain limits on the dollar amount of resources that AFDC recipients may have. Prior to 1981, the regulations allowed a recipient to possess up to $2000 in resources, and excluded the value of one automobile in making that calculation, without regard to the value of the automobile.

In 1981, however, Congress enacted the Omnibus Budget Reconciliation Act ("OBRA"), which, *inter alia*, for the first time set a statutory resource limit for AFDC recipients. The resource limit was reduced from the $2000 limit previously set by regulation to $1000 per family. 42 U.S.C. § 602(a)(7)(B). In addition, the statute excluded "so much of the family member's ownership interest in one automobile as does not exceed such amount as the Secretary shall provide." 42 U.S.C. § 602(a)(7)(B)(i).

Pursuant to this directive, the Secretary promulgated a regulation setting the automobile-equity limit at $1500. This figure was based on a 1979 survey which the Secretary stated showed that ninety-six percent of food-stamp recipients who owned cars had equity value in the cars of $1500 or less. The Secretary concluded that the $1500 limit was appropriate in that it would "be set within the range of the vast majority of current recipients ..." 47 Fed.Reg. at 5657 (1982). The analogous New York State regulation adopted the same limit because 42 U.S.C. § 602(a) in effect provides that a state AFDC plan must employ the limit chosen by the Secretary.

The automobile limit has remained at $1500 ever since, although it has received further attention by both Congress and the Secretary. In 1988, the House of Representatives adopted as part of the Family Support Act, Pub.L. No. 100–485, 102 Stat. 2343, 2356, a bill which would have allowed some states to experiment with a $4500 limit. The Senate version of the Act contained no such provision, and a conference committee "follow[ed] the Senate amendment (i.e., no provision)," but "direct[ed] the Secretary to review regulations establishing limits on the value of a vehicle and to revise them if he determines revision would be appropriate." House Conf.Rep. No. 100–998, 100th Cong., 2d Sess. 189 (1988), reprinted in 1988 U.S.C.C.A.N. 2776, 2879, 2977.

While the Secretary was undertaking this review, he received several inquiries from members of Congress concerning complaints from their constituents that the $1500 limit was too low, particularly in light of the effects of inflation over the years. The congressmen asked the Secretary to take those concerns into account in deciding whether to raise the limit. *See* Secretary's Memorandum of Law Ex. 2.

Upon completion of his review, however, the Secretary decided not to revise the limit. As the Secretary explained in a letter to Senator Dennis DeConcini dated March 23, 1992, the Secretary concluded that raising the limit to $3000 would cost an extra $200 million annually, which would have to be offset by reductions in other programs for needy children and families. *Id.* The Secretary decided that this was not desirable and that the limit should remain where it was.

## DISCUSSION

Under the well-established standard in the Second Circuit for granting a preliminary injunction, "the movant must demonstrate '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Wallace Int'l Silversmith v. Godinger Silver Art Co.*, 916 F.2d 76, 78 (2d Cir.1990), (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991). In the case at bar, plaintiff contends that she has met the standard by demonstrating irreparable harm if the motion is denied, and a likelihood of success on the merits.[1]

After considering the arguments presented by both sides, I find that plaintiff has failed to establish that she is likely to succeed on the merits. The motion for a preliminary injunction must therefore be denied.

Under the Administrative Procedure Act, 5 U.S.C. § 704 *et seq.*, a reviewing court may set aside an agency's action only if that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While the court should engage in "a thorough, probing, in-depth review" of the action, the court must not substitute its own judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). Rather, the court should defer to the agency if the agency's findings have a rational basis. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys.*, 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974).

Plaintiff maintains that she can demonstrate a likelihood of success on the merits because the challenged regulation limiting equity in an automobile to $1500 lacks a rational basis and is contrary to the intent of Congress in establishing the AFDC program.

Plaintiff devotes much of her argument to her contention that the Secretary's adoption of $1500 as the vehicle-equity limit was irrational to begin with. Plaintiff maintains that the Secretary's analysis and use of the 1979 food-stamp data was flawed for a number of reasons.

This is not the first jurisdiction in which this precise issue has been litigated, although it appears to be the first reported proceeding in the Second Circuit. There is a marked split of authority among the few courts that have addressed the validity of the $1500 limit.[2] Although none of these other decisions are binding on this Court, I have considered them all in determining the merits of the case before me.

Although I am certainly sympathetic to plaintiff in her plight, I do not believe that the proper remedy is a judicial one. In sum, I am not persuaded that plaintiff has shown a likelihood that she will prevail on the merits on this issue. Even assuming the validity of some of plaintiff's arguments, it still appears

1. Plaintiff has not argued that she has met the alternative, fair-ground-for-litigation standard. In addition, the Second Circuit has held that where a preliminary injunction "'seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme,' the less rigorous fair-ground-for-litigation standard should not be applied." *Sweeney v. Bane*, 996 F.2d 1384, 1388 (2d Cir.1993) (quoting *Plaza Health Labs., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989)).

2. The following courts have granted judgments in favor of plaintiffs challenging the limit: *Lamberton v. Shalala*, 857 F.Supp. 1349 (D.Ariz. 1994); *Hazard v. Sullivan*, 827 F.Supp. 1348 (M.D.Tenn.1993), *appeal pending*, Nos. 93–6214 and 93–6260 (6th Cir.); *Brown v. Shalala*, No. C–92–184–L (D.N.H. July 21, 1993), *appeal pending*, No. 93–2369 (1st Cir.); and *We Who Care, Inc. v. Sullivan*, 756 F.Supp. 42 (D.Me.1991).

Summary judgment has been granted for the Secretary in the following cases: *Falin v. Sullivan*, 776 F.Supp. 1097 (E.D.Va.1991), *aff'd*, 6 F.3d 207 (4th Cir.1993) (per curiam), *cert. denied*, —— U.S. ——, 114 S.Ct. 1551, 128 L.Ed.2d 200 (1994); *Champion v. Shalala*, 845 F.Supp. 1332 (S.D.Iowa 1993), *appeal pending*, No. 93–3967SID (8th Cir.); and *Gamboa v. Rubin*, No. 92–397 HMF (D.Haw. Nov. 4, 1993), *appeal pending*, No. 94–15302 (9th Cir.). In addition, the court in *Hall v. Towey*, No. 93–1780–CIV–T–21B (M.D.Fla. Dec. 10, 1993), denied a motion for a preliminary injunction similar to the one *sub judice* in the instant case.

that the Secretary had a rational basis for setting the limit at $1500.

Plaintiff argues that the population of AFDC recipients and that of food-stamp recipients were not identical because the two programs have different eligibility requirements. The Secretary was not insensitive to these differences, however, but he nevertheless found that there was a substantial correlation between the two groups. *Falin v. Sullivan*, 776 F.Supp. 1097, 1101 (E.D.Va. 1991), *aff'd*, 6 F.3d 207 (4th Cir.1993) (per curiam), *cert. denied*, —— U.S. ——, 114 S.Ct. 1551, 128 L.Ed.2d 200 (1994). He also found that food-stamp recipients were, on average, more affluent than AFDC recipients. 47 Fed.Reg. at 5657. Therefore, I do not find it likely that plaintiff can establish that these two groups were so dissimilar as to render the Secretary's use of this data irrational.

Plaintiff also contends that the Secretary was incorrect in stating that ninety-six percent of food-stamp recipients who owned cars had equity value in the cars of $1500 or less. In support of this argument, plaintiff has submitted a report by Dr. Peter S. Fisher, who holds a Ph.D. in economics. *See* Attachment to Affidavit of Elaine Frederick sworn to on Aug. 4, 1994. Dr. Fisher opines that the Secretary incorrectly included within this group not only recipients who owned cars with up to $1500 in equity value, but also recipients who owned no car at all. He also states that the Secretary ignored the seventeen percent of recipients whose automobile-equity value could not be determined. He concludes that it would have been more appropriate to find that 90.5 percent of food-stamp recipients who actually owned cars with a known equity value had equity in the vehicles of $1500 or less. *Id.* at 13.

However, as the court in *Gamboa v. Rubin*, No. 92–397 HMF, slip op. at 15 (D.Haw. Nov. 4, 1993), pointed out, this does not alter the fact that the $1500 limit would still leave ninety-six percent of the group studied eligible to receive benefits. And, like the *Gamboa* court as well as the courts in *Falin*, 776 F.Supp. at 1100, *Hall v. Towey*, No. 93–1780–CIV–T–21B, slip op. at 6 n. 3 (M.D.Fla. Dec. 10, 1993), and *Champion v.*

*Shalala*, 845 F.Supp. 1332, 1335 (S.D.Iowa 1993), I find that even accepting Dr. Fisher's view that 90.5 percent would have been a more appropriate figure, that still does not render irrational the Secretary's conclusion that the $1500 limit was "within the range of the vast majority of current recipients ..." 47 Fed.Reg. at 5657.

Plaintiff also argues that the Secretary improperly failed to take into consideration the special needs of some AFDC recipients, such as recipients living in rural areas. Plaintiff contends that a proper analysis would have taken into account the market value of average, reliable used cars, typical financing terms, etc.

As with plaintiff's critique of the Secretary's statistical analysis, however, this argument, while it may present an defensible alternative viewpoint, does not make the Secretary's decision unsupportable. The issue is not "whether the Secretary used the *best* available source to develop a regulation, but whether the Secretary's conduct was *reasonable*." *Champion*, 845 F.Supp. at 1335. More than one course of action may be reasonable. It might well have been rational for the Secretary to have undertaken the sort of study suggested by plaintiff. That does not mean, though, that the decision he actually made is unsound simply because he followed a different course of action. In sum, none of plaintiff's attacks on the Secretary's initial arrival at the $1500 figure persuade me that plaintiff is likely to prevail on the merits.

■ In addition to challenging the Secretary's initial decision to limit equity at $1500, plaintiff claims that the Secretary has acted arbitrarily and capriciously by not adjusting that figure over time to account for inflation. I conclude that there is no likelihood that plaintiff will prevail on the merits as to this contention.

The statute, 42 U.S.C. § 602(a)(7)(B)(i), which directed the Secretary to create the exclusion, places no duty upon the Secretary to periodically adjust the limit. Furthermore, while inflation has undoubtedly eroded the value of the limit when measured in constant dollars, that is but one factor that the Secretary may consider, along with the

added costs that would ensue if the limit were raised, and the impact that those costs would have on other worthy programs. I find it unlikely that plaintiff will prevail on her claim that it was irrational or arbitrary for the Secretary not to raise the limit after he had balanced all the relevant factors.[3]

■ Plaintiff also argues that maintaining the AFDC limit at $1500 constitutes a denial of equal protection because it is dramatically lower than that for Supplemental Security Income ("SSI") benefits for needy disabled persons. By statute, pursuant to 42 U.S.C. § 1382b(a)(2)(A) the Secretary is directed to exclude from an SSI applicant's resources "household goods, personal effects, and an automobile, to the extent that their total value does not exceed such amount as the Secretary determines reasonable." Pursuant to that authority, the Secretary has promulgated a regulation that completely excludes a single automobile if it is "necessary for employment" or "medical treatment," or if it is necessary "because of climate, terrain, distance, or similar factors to provide necessary transportation to perform essential daily activities." 20 C.F.R. § 416.1218(b)(1). If none of these complete exclusions apply, the vehicle may be excluded up to $4500 in market value. 20 C.F.R. § 416.1218(b)(2).

These are two separate programs, however, and there is no Constitutional requirement that they utilize the same eligibility requirements and limitations. *Gamboa,* slip op. at 19. As the court in *Champion* observed, it is not the task of this court to assess the consistency or wisdom of federal welfare programs. 845 F.Supp. at 1336. Nor is it for the court to decide whether, in a moral sense, plaintiff deserves benefits. Rather, my task is limited to determining whether the Secretary's actions have a rational basis when measured against the statutes—specifically, the OBRA amendments—that are the source of his authority.

■ Plaintiff next argues that the regulation is contrary to the legislative intent un-

derlying the AFDC program because it is too low to enable recipients to achieve financial independence. Plaintiff also argues that the Secretary's failure to adjust the limit to offset inflation is arbitrary and capricious and not consistent with congressional intent.

Although plaintiff presents these as separate, discrete arguments, they both relate closely to an analysis of congressional action (or inaction) in the years since AFDC was instituted. I find that plaintiff is unlikely to prevail on these matters.

Plaintiff correctly states that the AFDC program is intended to allow recipients to attain financial self-sufficiency. The inquiry into Congress's intent, however, does not end with the creation of AFDC. It must be remembered that the $1500 vehicle-equity limit was actually set not contemporaneously with the original enactment of AFDC, but pursuant to OBRA, "the central purpose of which was to reduce government expenditures." *Travelers Ins. Co. v. Cuomo,* 14 F.3d 708, 716 (2d Cir.1993). Thus, "[d]espite the fundamental objectives of the AFDC program, ... it must be acknowledged that the primary purpose of the OBRA amendments

> is to reduce or eliminate welfare benefits for those considered by Congress to be less needy than those completely without resources—persons or households that have available other sources of income or resources with which to support themselves.

*James v. O'Bannon,* 715 F.2d 794, 809 (3d Cir.1983) (quoting *Philadelphia Citizens in Action,* 669 F.2d 877, 879 (3d Cir.1982)), *cert. denied,* 470 U.S. 1050, 105 S.Ct. 1746, 84 L.Ed.2d 812 (1985).

Thus, while Congress obviously felt that there should be some exemption for a family automobile, it was equally concerned that there be a limit on that exemption which would further the goal of cost-cutting which was the impetus behind OBRA. Congress also declined to set the limit itself, nor did it direct the Secretary to make periodic adjust-

---

**3.** Plaintiff alleges that the Secretary has recently announced a proposal to raise the limit. However, it appears that this is tied to pending legislation on welfare reform. Nothing concrete has been done to date, though, nor is there any

evidence that any significant action is imminent. I fail to see, therefore, how the possibility of an upward revision of the limit at some unknown date in the future makes it more likely that plaintiff will succeed on the merits in this case.

ments to the limit as necessary to offset inflation. Instead, it left these matters to the Secretary's discretion.

Subsequent congressional action provides further proof that Congress has been content with the Secretary's decisions to set, and keep, the limit at $1500. Although the House of Representatives passed a bill in 1988 that would have allowed some states to raise the limit on a trial basis, the conference committee ultimately decided not to raise the limit, or even to direct the Secretary to raise the limit to a level that he determined to be appropriate. Instead, Congress again chose to trust the matter to the Secretary's discretion, directing the Secretary to review the relevant regulations "and to revise them if he determines revision would be appropriate." House Conf.Rep. No. 100–998, 100th Cong., 2d Sess. 189 (1988), reprinted in 1988 U.S.C.C.A.N. 2879, 2977.

Nor did Congress completely forget about the matter thereafter. As noted previously, several members of Congress followed up on the Secretary's review of the limit, asking him to consider the concerns of their constituents. In the end, however, the Secretary reported his conclusion that raising the limit would entail large expenses which he deemed prohibitive when balanced against the offsetting budget cuts that would have to be made in other programs.

The Supreme Court "has often recognized [that] the construction of a statute by those charged with its administration is entitled to substantial deference," and that "[s]uch deference is particularly appropriate where ... an agency's interpretation involves issues of considerable public controversy, and Congress has not acted to correct any misperception of its statutory objectives." *United States v. Rutherford,* 442 U.S. 544, 554, 99 S.Ct. 2470, 2476, 61 L.Ed.2d 68 (1979). As indicated by the attention that members of Congress have paid to this matter, and the number of lawsuits that have been filed challenging the $1500 limit, this issue could fairly be described as a matter of some controversy. Congress's failure to alter the *status quo* thus far therefore adds not a little weight to the Secretary's decision to leave the limit where it stands.

That is not to say that courts should simply refuse to act in matters of agency action simply because Congress has done nothing. To do so would be to abdicate the courts' proper role. It is for that reason that "[o]rdinarily, and quite appropriately, courts are slow to attribute significance to the failure of Congress to act on particular legislation." *Bob Jones Univ. v. United States,* 461 U.S. 574, 599–600, 103 S.Ct. 2017, 2032, 76 L.Ed.2d 157 (1983).

At the same time, however, "[i]t is well established that 'once an agency's statutory construction has been "fully brought to the attention of the public and Congress," and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.'" *Appeal of Bolden,* 848 F.2d 201, 209 (D.C.Cir.1988) (quoting *Rutherford,* 442 U.S. at 554 n. 10, 99 S.Ct. at 2476 n. 10). Here, the Secretary's initial setting of the limit at $1500 was brought to the attention of the public and Congress when the regulation was promulgated and the supporting study was released. *Cf. Estey v. Commissioner, Maine Dep't of Human Services,* 21 F.3d 1198, 1207 (1st Cir.1994) (little evidence to support inference of congressional awareness of agency's interpretation of federal energy-assistance exclusion where agency never embodied its interpretation in a regulation).

Moreover, Congress had a clear opportunity to change the vehicle-equity limit when it passed the Family Support Act in 1988. Certainly inflation had already had an impact on the limit by that time. In the end, however, Congress chose not to intervene, but left the matter to the Secretary's discretion. In the years since the Secretary decided to leave the limit untouched, Congress has taken no further action.

In my view, these facts do warrant an inference that Congress has been made aware of the amount of the limit, of the basis for the limit, and of the fact that it has not been raised since its adoption. That Congress has declined to intervene in the years that the equity limit has been on the books indicates that the Secretary's decisions in

this area have not been contrary to Congress's intent. I therefore conclude that plaintiff has not established a likelihood that she will prevail on this issue.

This discussion suggests a more basic defect with plaintiff's case. Despite the apparently dire predicament facing plaintiff, this court's role in the matter is a limited one. Sympathy for a plaintiff, no matter how well-deserved, does not constitute a basis to intervene in matters delegated by Congress to an administrative agency. The current automobile-equity limitation, though promulgated by the Secretary, is in a sense ultimately traceable to Congress, which gave the Secretary the authority to set the limit, and which so far has declined to disturb his decision not to raise it. If the limit is unduly harsh, then, the remedy should emanate from Congress, and it is there that plaintiff, and those like her, should look for relief.

### CONCLUSION

Plaintiff's motion for a preliminary injunction is denied.

IT IS SO ORDERED.